Jack R. Tuholske
Tuholske Law Office PC
234 E. Pine/P.O. Box 7458
Missoula MT 59802/07
406-396-6415
tuholske@centric.net

**FILED**
SEP 0 7 2010
PATRICK E. DUFFY, CLERK
By_____
DEPUTY CLERK, MISSOULA

*Attorney for the Plaintiffs*

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| Wildlands CPR Inc., Friends of the Bitterroot Inc., Montanans for Quiet Recreation, Inc. ) ) ) ) ) | **Civil Action No.** $CV$-10-104-$m$-$DWM$ _____ |
| ) Plaintiffs, ) ) | **COMPLAINT** |
| v. ) ) | |
| UNITED STATES FOREST SERVICE; LESLIE WELDON, in her official capacity as the Regional Forester for Region 1, GLORIA MANNING, in her official capacity of the appeal deciding officer for the Chief of the Forest Service, Dave Meyer, in his official capacity as Forest Supervisor for the Beaverhead Deerlodge National Forest, ) ) ) ) ) ) ) ) ) | |
| Defendants. | |

## I. INTRODUCTION

1.      This is a civil action for judicial review under the Administrative

Procedure Act, 5 U.S.C. §§ 701 *et seq.* of the United States Forest Service's

("Forest Service") Revised Land and Resource Management Plan ("Revised Forest

Plan") for the Beaverhead-Deerlodge National Forest ("BDNF").  The Revised

Forest Plan designates 60 percent of the national forest as open to snowmobiling.

This decision has profound environmental and socioeconomic impacts.

Snowmobiling has deleterious effects on many wildlife species.  It conflicts with

and often limits increasingly popular non-motorized winter recreation

opportunities.  The Forest Service failed to take a hard look at the consequences of

designating vast areas of public land open to snowmobile use.  Defendant's

approval of the revised Forest Plan violates the National Environmental Policy Act

("NEPA"), 42 U.S.C. § 4331 *et seq.*; the Administrative Procedure Act ("APA"), 5

U.S.C. §§ 701 *et seq.*; Executive Order 11644, Section 1, 37 Fed. Reg. 2877 (Feb.

9, 1972); and Executive Order 11989, 42 Fed. Reg. 26959 (May 25, 1977).

## II. JURISDICTION

2.     This action arises under the laws of the United States and involves the United States as a Defendant. This Court has subject matter jurisdiction over the claims specified in this complaint pursuant to 28 U.S.C. §§ 1331, 1346.

3.     An actual, justiciable controversy exists between Plaintiffs and Defendants. Plaintiffs' members use and enjoy the Beaverhead-Deerlodge National Forest for skiing, snowshoeing, hiking, fishing, hunting, camping, photographing scenery and wildlife, and engaging in other vocational, scientific, spiritual, and recreational activities. Plaintiffs' members use the areas within the Beaverhead-Deerlodge National Forest that have been designated as open to snowmobile use through the Revised Forest Plan, and as a result of the decisions made in the Revised Forest Plan their use and enjoyment of these specific areas will be diminished. Plaintiff's members intend to continue to use and enjoy the areas opened to snowmobiling frequently and on an ongoing basis in the future. Plaintiffs and their members rely on the Defendants to follow the laws pertaining to environmental review and travel planning in order that Plaintiffs and their members may stay informed and participate in travel planning decisions, and their interests in participating in such decisions are injured by the failures of the Defendants to follow the laws and regulations as set forth herein.

4.     The aesthetic, recreational, scientific, spiritual, and educational interests of Plaintiff's members have been and will be adversely affected and

irreparably injured if Defendants are allowed to continue implementing the
Revised Forest Plan as approved.  These are actual, concrete injuries caused by
Defendants' failure to comply with mandatory duties under NEPA, APA, and
Executive Orders.  The requested relief would redress these injuries and this Court
has the authority to grant Plaintiffs' requested relief under 28 U.S.C. §§ 2201 &
2202, and 5 U.S.C. §§ 705 & 706 by insuring that the Defendants adequately
consider the consequences of their decision, comply with Executive Orders 11644
and 11989, and promulgate travel management regulations that are in full
compliance with all applicable laws and regulations.

     5.     Each of the Plaintiff organizations includes within its mission and
purpose the promotion of sound use of public lands, the protection of the wildlife
that inhabit such lands, and the promotion of non-motorized winter recreation
opportunities on public lands.  The Plaintiff organizations have an interest in
insuring that federal agencies follow the law, including travel planning processes
and procedures of the statutes, regulations, and Executive Orders embodied in this
complaint. The organizational interests of Plaintiffs are adversely affected and
injured by the Defendants' failures as alleged herein. This suit is filed on behalf of
the organizations and their members.

6.     On January 14, 2009, Tom Tidwell, the Regional Forester for Region One of the United States Forest Service, signed the Record of Decision ("ROD") for the Beaverhead-Deerlodge National Forest.

7.     On October 30, 2009, Gloria Manning, Reviewing Officer for the Chief of the United States Forest Service, denied Plaintiff's administrative appeals of the Revised Forest Plan.

8.     Plaintiffs, or some of them, submitted extensive, written comments concerning the Revised Forest Plan and fully participated in the available administrative review and appeal processes. Thus, they have exhausted their administrative remedies. Defendants' denial of Plaintiffs' administrative appeals constitutes the final administrative actions of the Forest Service. Thus, the challenged decision is final, ripe for review, and subject to this Court's review under the APA, 5 U.S.C. §§ 702, 704, 706.

## III. VENUE

9.     Venue is proper in this case under 28 U.S.C. § 1391 (e) and LR 3.3(a)(1). The Beaverhead National Forest is located in part within Granite County, within the Missoula Division of the District Court of Montana. Defendant Weldon resides in Missoula, Montana, also in the Missoula Division. Plaintiff Wildlands CPR has its national headquarters located in Missoula, Montana.

## IV. PARTIES

5

10.     Plaintiff WILDLANDS CPR is a non-profit corporation dedicated to reviving and protecting wild places by promoting watershed restoration to improve fish and wildlife habitat, provide clean water, and enhance community economies. It focuses on reclaiming ecologically damaging, unneeded roads and on stopping off-road vehicle abuse. Its members use and will continue to use the Beaverhead-Deerlodge National Forest for work and for outdoor recreation of all kinds, including fishing, hunting, hiking, horseback riding, skiing, and snowshoeing. The Forest Service's unlawful Forest Plan adversely affects Wildland CPR's organizational interests, as well as its members' use and enjoyment of the Beaverhead-Deerlodge National Forest. Wildlands CPR brings this action on its own behalf and on behalf of its adversely affected members.

11.     Plaintiff FRIENDS OF THE BITTERROOT ("Friends") is a 501(c)(3) non-profit organization with over 600 members dedicated to protecting the quality of life in the Bitterroot valley and surrounding National Forests, including the Bitterroot, Beaverhead-Deerlodge, Salmon, and Lolo National Forests. Friends is also focused on ensuring USFS compliance with federal environmental laws such as the National Environmental Policy Act, the National Forest Management Act, and the Endangered Species Act.

12.     Plaintiff MONTANANS FOR QUIET RECREATION ("MQR") has over 225 members, mostly located in southwest Montana.  MQR represents the

6

silent majority of people passionate about hiking, fishing, horseback riding and all things outdoors, and who believe the interests of those who enjoy quiet, muscle-powered recreation on Montana's public lands need a strong voice. MQR focuses solely on promoting non-motorized activities, and has an exclusive interest in ensuring quiet recreation is adequately considered during planning processes through the application of relevant laws and regulations.

13.   Defendant LESLIE WELDON is the Regional Forester for the Northern Region of the U.S. Forest Service, and in that capacity is charged with ultimate responsibility for ensuring that decisions made at the National Forest level in the Northern Region, including the Beaverhead-Deerlodge National Forest, are consistent with applicable laws, regulations, and official policies and procedures. She is the highest official and representative of Defendant U.S. Forest Service in the District of Montana. Defendant Weldon replaced as the Regional Forester Tom Tidwell, who signed the Record of Decision for the Beaverhead-Deerlodge National Forest Revised Forest Plan.

14.   Defendant GLORIA MANNING is the Reviewing Officer for the Chief of the U.S. Forest Service, and in that capacity denied Plaintiffs' administrative appeals of the Beaverhead-Deerlodge Revised Forest Plan.

15.   Defendant DAVE MYERS is the Forest Supervisor for the Beaverhead-Deerlodge National Forest. Defendant Myers signed the Record of

7

Decision Enacting Forest Plan Travel Management Direction that opened 60

percent of the Beaverhead-Deerlodge National Forest to snowmobile use.

16.     Defendant UNITED STATES FOREST SERVICE is an

administrative agency within the U.S. Department of Agriculture, and is

responsible for the lawful management of our National Forests, including the

Beaverhead-Deerlodge National Forest.

## V. BACKGROUND

### Beaverhead-Deerlodge National Forest

17.     The Beaverhead-Deerlodge National Forest ("BDNF") covers over 3

million acres of land and is the largest National Forest in Montana. Sitting astride

the Continental Divide, the BDNF contains outstanding scenery, rich and varied

wildlife, and plentiful opportunities for all types of recreation. The amenity and

recreation values of the BDNF far outweigh the value of commodity production

within the forest. The forest is located in southwest Montana and is a mecca for

outdoor enthusiasts. Its extended winter and cold and dry Montana weather mean

powdery snow—ideal for backcountry and cross-country skiing. The deep snow

allows for over 100 ski days per year. FEIS 352. Visitors can take in views of

dramatic mountain peaks rising more than 10,000 feet that feed high alpine lakes.

The forest also contains an abundance of wildlife; over 340 terrestrial wildlife

species call the BDNF home. FEIS 485. Grizzlies, wolves, and the elusive

8

wolverine roam the forest. Southwestern Montana is also home to over 40 percent of the state's elk population. FEIS 488.

## Forest Plan Background

18.     The National Forest Management Act ("NFMA") governs the management of our national forests.  The statute was passed by Congress to provide a comprehensive method for planning and management of our national forests. The NFMA requires the Forest Service to develop a Land Resource Management Plan  ("Forest Plan") for each unit of the National Forest System. 16 U.S.C. § 1604(f)(1). As part of the planning process, the Forest Service is required to revise the Forest Plan at least every fifteen years. 16 U.S.C. § 1604(f)(5)(a). Once enacted, the Forest Plan governs the use of the forest, and all activities must be consistent with the standards and guidelines contained in the Forest Plan.

19.     On January 14, 2009, the Regional Forester signed the Record of Decision for the Beaverhead-Deerlodge National Forest Revised Plan. The Revised Forest Plan replaced the 1986 and 1987 Forest Plans for the Beaverhead and Deerlodge National Forests. The Beaverhead and Deerlodge National Forests were administratively separate and each had their own Forest Plan before the Forests were combined and the Revised Forest Plan was approved.  Now they are governed as one administrative unit under one Forest Plan.

20.     The Appeal decision states that:

The Revised Plan (p. 14) makes broad, strategic decisions that identify goals, objectives, standards, and suitable uses for large areas of land. The Revised Plan identifies a number of areas where winter motorized use is allowed. Page 74 of the FEIS and page 55 of the RFP display these areas on a map. These areas are identified in the winter management allocations (Table 9, RFP, p. 30). Winter motorized use is allowed on approximately 2 million acres (Table 100, FEIS, p. 366) and is not allowed on approximately 1.3 million acres (Table 98, FEIS, p. 365).

Appeal decision 95.

21.     The Revised Forest Plan allows over-snow vehicle use on 60 percent of the entire Forest, making available over 2 million acres for winter motorized use. Revised Forest Plan ROD, Table 1 at p. 15. The Winter Recreation Allocation Map on page 55 of the Revised Forest Plan depicts specific areas that are available to winter motorized recreational use as a result of the adoption of the Revised Forest Plan. Thus the Forest Plan is a decision by the Defendants to designate specific areas of the National Forest to snowmobile use. The Forest Service confirmed this decision in its response to the Plaintiffs' administrative appeals. No further administrative action was necessary to designate these areas as open to snowmobile use.

## National Environmental Policy Act Background

22.     The National Environmental Policy Act ("NEPA") "is our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a).

23.     Although NEPA does not impose any substantive requirements on federal agencies, it does impose procedural requirements.

24.    NEPA requires that an Environmental Impact Statement ("EIS") be prepared for all "major Federal actions significantly affecting the quality of the human environment," including all environmental impacts of the proposed action. 42 U.S.C. § 4332(2)(C)(i)-(v).

25.    An EIS should contain a discussion of significant environmental impacts and alternatives to the proposed action. *See* 40 C.F.R. §§ 1502.1, 1502.14, 1508.7. NEPA requires an analysis of the environmental impacts to the "fullest extent possible." 42 U.S.C. § 4332.

**Executive Orders Background**

26.    Executive Orders 11644 and 11989 were signed by former Presidents Nixon and Carter, respectively, in response to increased OHV (also referred to as off-road vehicle, or "ORV") use on public lands.

27.    The purpose of the Executive Orders is to:

establish policies and provide for procedures that will ensure that the use of off-road vehicles on public lands will be controlled and directed so as to protect the resources of those lands, to promote the safety of all users of those lands, and to minimize conflicts among the various uses of those lands.

Executive Order 11644, Section 1, 37 Fed. Reg. 2877 (Feb. 9, 1972).

28.    The Orders are in furtherance of the purpose and policies of NEPA. *Id.*; Executive Order 11989, 42 Fed. Reg. 26959 (May 25, 1977).

29.    Executive Order 11644 requires the Forest Service to develop

regulations and administrative instructions for the designation of areas and trails on

which OHV use would be permitted. Executive Order 11644, Section 3.

30.     Executive Order 11644 defines "off-road vehicle" as "any motorized

vehicle designed for or capable of cross-country travel on or immediately over

land, water, sand, snow, ice, marsh, swampland, or other natural terrain." This

definition includes snowmobiles. The Forest Service acknowledged this when

promulgating its travel management regulation in 2005:

> Snowmobiles are "off-road vehicles" under E.O. 11644 and subject to the
> direction "to provide for administrative designation of the specific areas and
> trails on public lands on which the use of off-road vehicles may be
> permitted, and areas in which the use of off-road vehicles may not be
> permitted" (E.O. 11644, Sec. 3(a)). Moreover, snowmobiles are "motor
> vehicles" under this final rule. Since this rule regulates motor vehicle use,
> the rule must address snowmobiles.... the final rule exempts snowmobiles
> from the mandatory designation scheme provided for under § 212.51, but
> retains a manager's ability to allow, restrict, or prohibit snowmobile travel,
> as appropriate, on a case-by-case basis (§ 212.81).

70 Fed. Reg. 68,273 (DATE).

31.     The Executive Orders apply equally to, and require the analysis and

minimization of impacts from, all types of off-road vehicles. The Executive

Orders do not distinguish between impacts from snowmobile use and impacts

caused by wheeled off-road vehicles. The BDNF admits this requirement in its

appeal response decision:

> E.O. 11644, as amended by E.O. 11989, directs federal agencies to issue
> regulations providing for designation of areas and trails on federal lands
> where off-road vehicle use, including use by over-snow vehicles, may be

12

permitted. Forest Service regulations implementing E.O. 11644 are found at 36 CFR Part 212, Subparts B and C. The new regulations at 36 CFR 212.51 provide for restrictions and prohibitions by vehicle class and time of year for motor vehicles other than over-snow vehicles. Part 212, Subpart C, addresses over-snow vehicle use. Specifically, 36 CFR 212.81(a) provides that use by over-snow vehicles may be allowed, restricted, or prohibited. These regulations superseded 36 CFR Part 295, which provided at 36 CFR 295.2 for use of the land management planning process to allow, restrict, or prohibit use by off-road vehicles.

Appeal decision 94-95.

32.    Agency regulations must therefore implement certain criteria when

locating snowmobile areas and trails:

> (1) Areas and trails shall be located to minimize damage to soil, watershed, vegetation, or other resources of the Public lands.
> (2) Areas and trails shall be located to minimize harassment of wildlife or significant disruption of wildlife habitats.
> (3) Areas and trails shall be located to minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such issues with existing conditions in populated areas, taking into account noise and other factors.

Executive Order 11644, Section 3.

33.    36 C.F.R. § 212.81 is the regulation promulgated by the Forest

Service in 2005 to implement the ORV EOs with regard to snowmobiles. It does

so in the following manner:

> (a) *General.* Use by over-snow vehicles on National Forest System roads and National Forest System trails and in areas on National Forest System lands may be allowed, restricted, or prohibited.

**\*\*\***

13

(c) *Establishment of restrictions and prohibitions.* If the responsible official proposes restrictions or prohibitions on use by over-snow vehicles under this subpart, the requirements governing designation of National Forest System roads, National Forest System trails, and areas on National Forest System lands in §§ 212.52, 212.53, 212.54, 212.55, 212.56, and 212.57 shall apply to establishment of those restrictions or prohibitions.

34.     The FEIS did not analyze on a site specific basis whether each area designated for snowmobile use through the Revised Forest Plan would damage resources, harass or disrupt wildlife, or conflict with other recreational uses. Furthermore, it did not minimize those impacts as required by the EOs. Finally, the 2005 Travel Management Rule fails to adequately implement the requirements for snowmobile management outlined in the EOs.

## Snowmobile Impacts on Wildlife and Recreation

35.     The Revised Forest Plan opens approximately 60 percent of the forest to snowmobile use. Revised Forest Plan ROD.

36.     Snowmobiles have adverse impacts on non-motorized recreation and wildlife. The number of cross-country skiers is decreasing in areas where snowmobile use is allowed to increase. *See* FEIS 350.

37.     The Revised Forest Plan calls for "[i]ncrease[d] opportunities for non-motorized winter activities, such as ski-touring and snowshoeing." Revised Forest Plan at 31.

38.     The FEIS found that there has been a large increase in snowmobile use on the BDNF in the last twenty five years. FEIS 16, 350. The "unmanaged

14

expansion" has "resulted in resource damage, wildlife impacts, and competition and conflict between user groups." ROD 13.

39.     There are only three trail systems maintained specifically for cross-country skiers in the BDNF. FEIS 353.

40.     Modern snowmobiles that are used on the BDNF have the ability to travel to steep, remote, ungroomed areas that were never previously accessible to riders. More powerful engines allow snowmobiles to travel into steeper terrain and cover much greater distances. As a result, snowmobile impacts on other resources are more serious, more widespread and further-reaching than ever before.

41.     Snowmobile use causes numerous environmental impacts that affect non-motorized winter recreational use. Noise pollution from snowmobile use can be heard for miles, despoiling the quiet recreation experience often sought by non-motorized winter recreationists. Air pollution and exhaust smell also extend for great distances from snowmobile use, detracting from the experience of non-motorized recreationists. Wildlife viewing opportunities are diminished by snowmobile use. Direct conflicts regarding trail use and increased safety problems occur when skiers and snowshoers try to use the same trails and areas that are being used by snowmobilers.    These conflicts have occurred in the past on the BDNF. These impacts will continue to occur and will likely increase as a result of

the decision made in the Revised Forest Plan to permit snowmobile use on approximately 60 percent of the Forest.

42. Snowmobile use also causes environmental impacts to wildlife on the BDNF. Wildlife species that inhabit the Forest, including but not limited to elk, wolverine, lynx and mountain goats, experience displacement in winter from snowmobile intrusions into their habitat at the time when demands on their energy reserves are highest. FEIS 509. Snowmobiling on the BDNF has already displaced big game such as moose, elk, mountain goat, mule deer, and bighorn sheep from their winter range, and increased snowmobile use will further stress these animals on their winter range. FEIS 537, 487.

43. The Forest Plan designates more than 50 percent of big game winter range to snowmobiles. FEIS 512. Monitoring has shown that moose have been displaced in some areas of the forest by increased snowmobile use. FEIS 509. Snowmobile use is also displacing elk from traditional winter ranges on public land to range on private land where "they are not welcome." FEIS 492; 509-510. For example, moose have been displaced from parts of the West Fork Madison River and elk have been displaced from traditional winter range in Berkins Flat on the Jefferson Ranger District.

16

44.     Secure areas for elk are directly impacted by motorized vehicle disturbance. FEIS 513. Elk avoid snowmobiles, thereby reducing habitat otherwise available to them. FEIS 513.

45.     The FEIS noted that "motorized winter recreation can create localized disturbance to wildlife." FEIS 516. Despite this admission, the FEIS does not analyze how the Revised Forest Plan will impact specific species at the site-specific level, in the areas and on the trails where snowmobile use is permitted under the Revised Forest Plan. FEIS 516.

46.     The BDNF designated the wolverine as a Management Indicator Species ("MIS"). FEIS 489. MIS species are selected to indicate the effects of management activities. FEIS 493. The "wolverine was selected as [a] wildlife MIS to measure the effectiveness of maintaining winter denning habitat secure from snowmobile impacts." FEIS 489.

47.     Wolverines are found at low densities throughout the BDNF. *See* FEIS 494. Their denning habitat consists of high mountain cirques that were historically considered inaccessible to snowmobiles. FEIS 509-510. Technological advances have allowed snowmobiles to penetrate farther into these backcountry areas. FEIS 350.

48.     Female wolverines are negatively impacted by snowmobiles near their den sites. *See* FEIS 513. Snowmobile disturbances can have adverse effects on

17

survival of their young. FEIS 513; Revised BE 98. In addition, "increased cross-country snowmobile use can also displace wolverines from big-game winter range where they can forage on winter-killed elk and deer." FEIS Appendix B-48.

49.     The FEIS divides the forest into different landscapes and displays in a table what percent of each landscape is closed to snowmobiling for wolverine denning. FEIS 510-511, Table 177.

50.     The Forest Plan opens up nearly 30 percent of all wolverine denning habitat to snowmobile disturbances. FEIS 511, Table 177.

51.     More than 90 percent of the wolverine denning areas in one landscape (Upper Clark Fork) are unprotected from snowmobile use. FEIS 510-511, Table 177.

52.     Besides the table, the FEIS does not analyze or disclose the impacts to wolverines from snowmobile use in each of these specific areas.

53.     Appendix B (Biological Evaluation or BE) of the FEIS states that "individual impacts to wolverines may occur," but does not disclose what the impacts might be, or which specific areas may contain individually impacted wolverines. *See* FEIS Appendix B-49.

54.     The Revised Biological Evaluation still contemplates snowmobiles in nearly 30 percent of wolverine denning habitat, but does not mention or assess on a

site specific basis impacts from snowmobile use to wolverines in these areas.

Revised BE 103.

55.    Mountain goats were also selected as a MIS to help assess management of high elevation snowmobile use. FEIS 489. Snowmobiling will affect mountain goats in their winter range. FEIS 494. The FEIS did not analyze the impacts to mountain goats at a site-specific level.

**Appeal Background**

56.    Plaintiffs filed administrative appeals of the Revised Forest Plan. Other organizations aligned with Plaintiffs' interests also filed administrative appeals. These appeals raised the basic issues that are now presented to the Court. Plaintiffs have exhausted their administrative remedies.

57.    Plaintiffs' appeal alleged that the Revised Forest Plan failed to meet the requirements under Executive Orders 11644 and 11989. Appeal 2-6.

58.    The Forest Service appeal response failed to respond to Plaintiffs' allegations of failure to comply with the EOs, and like the FEIS fails to illustrate how the requirements of the EOs were fulfilled by minimizing impacts from allowing snowmobile use on the BDNF. *See* Appeal Decision 94-95.

59.    The Forest Service made no substantive response to each of Plaintiffs' appeal points in the Appeal Decision.

60. Plaintiffs' appeal alleged the Revised Forest Plan violated NEPA by failing to take a "hard look" at the impacts to wolverine and big game in the areas designated for over-snow vehicle use. Plaintiffs' Appeal 8-10.

61. The Forest Service responded with citations to the FEIS and BE, but these references fail to disclose site specific information, including how individual wildlife species would be impacted. *See* Appeal Decision 22-23.

62. The agency also cited a table, which noted specific areas where wolverine denning habitat and big game habitat would be open to snowmobile use, but which did not analyze the specific impacts to individual species in the areas open to use. Appeal Decision 22; FEIS 510 Table 122.

63. Finally, the Forest Service response pointed to future monitoring to satisfy its requirement that the FEIS take a "hard look" at how snowmobile use would impact wildlife. Appeal Decision 23. "Future monitoring" is an inadequate substitute for the analysis and disclosure requirements of NEPA.

64. Plaintiffs alleged the Forest Service failed to consider the importance of the Hellroaring drainage and Mt. Jefferson Area in providing wolverine habitat and non-motorized winter recreational opportunities. Plaintiff's Appeal 13-14.

65. The Forest Service responded that the Mt. Jefferson/Hellroaring area "represents a management challenge, because the boundary between the motorized and non-motorized use areas does not follow an effective topographical barrier to

illegal motorized entry." Appeal Decision 23; ROD 21. The Forest Service did
not analyze how wolverine denning habitat will be impacted by its designation of a
portion of this area as open to winter motorized use or if its "heavy reliance" on
"voluntary compliance" by snowmobilers is not adhered to. ROD 21. Moreover,
the Revised FEIS states that 100 percent of the Mount Jefferson Management Area
is open to snowmobiling, and snowmobiling within the area "takes place in high
elevation settings." Revised FEIS 146-147. The FEIS also found that the non-
wilderness recommendation for half of the Mt. Jefferson Inventoried Roadless
Area does not positively respond to the need for secure wolverine habitat in the
southern area closed to snowmobile use. *See* FEIS, Appendix C-111.

66. The area known as "wolverine basin" within the Hellroaring
Management Area is open to snowmobile use. *See* Revised FEIS 137-138.

67. Plaintiff alleged the Forest Service failed to take a hard look at the
cumulative impacts on wildlife. *See* Plaintiff's Appeal 13-14; Appeal Decision 23.

68. The Forest Service responded by stating "these effects will vary
depending on the individual needs and habitat of individual species and impacts
from resource use outside Forest boundaries." Appeal Decision 23; FEIS 535.

69. The Appeal Decision did not analyze the individual needs and habitat
of individual species and impacts from resource use outside Forest boundaries.

21

70.     The Defendants' failure to respond to specific issues in the administrative appeal constitutes a failure to consider relevant factors and is an abuse of discretion and is arbitrary and capricious.

71.     The Defendants' failure to also analyze site specific impacts and minimize those impacts in compliance with the EOs and TMR are also in violation of law, an abuse of discretion, and arbitrary and capricious.

## VI. CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF - NEPA

72.     Plaintiffs hereby reallege and incorporate all previous paragraphs as if set forth in full.

73.     NEPA requires the Forest Service to take a hard look at all of the environmental consequences on wildlife and recreation as alleged herein of its decision to open to snowmobiling more than two million acres of the BDNF.

74.     The Forest Service's failure to address the specific issues raised in the appeal and administrative comments, which pointed to deficiencies in the NEPA analysis, is a failure to consider the relevant factors.

75.     The agency's failure to analyze the direct and cumulative impacts of snowmobile use on wildlife and quiet recreation on the entire forest and at the site-specific level violates NEPA's mandate to analyze impacts to the "fullest extent

possible." As alleged herein, Plaintiffs' pointed out this failure with specificity for the Hellroaring Basin/Mount Jefferson Management Area. Appeal 11-15.

76.     The Forest Service admitted that "motorized winter recreation can create localized disturbance to wildlife." FEIS 516. However, the FEIS failed to analyze the localized disturbances, nor did it state which species will be disturbed and which will not.

77.     The Revised Forest Plan designates more than 50 percent of big game habitat as open to snowmobiles. As alleged herein the FEIS failed to detail how the Revised Forest Plan will impact specific species—moose, elk, mountain goats, wolverine, or otherwise—at the site specific level.

78.     The FEIS conclusion that "[c]umulative effects will vary depending on the individual needs and habitat of individual species" is cursory and violates NEPA's hard look requirement. FEIS 535.

79.     An EIS must "state how alternatives considered in it and decisions based on it will or will not achieve the requirements of ... [NEPA] and other environmental laws and policies[,]" 40 C.F.R. § 1502.2(d), and discuss "[p]ossible conflicts between the proposed action and the objectives of Federal ... policies and controls for the area concerned[,]" 40 C.F.R. § 1502.16(c).

80.     The FEIS violated NEPA by failing to consider the requirements of Executive Orders 11644 and 11989 and by failing to discuss the possible conflicts

between the Revised Forest Plan and the objectives and policies of the executive orders.

81.     For the reasons alleged herein, the FEIS prepared for the Revised Forest Plan is unlawful, arbitrary and capricious, and an abuse of discretion in violation of NEPA and the APA.

## SECOND CLAIM FOR RELIEF – REVISED FOREST PLAN

## VIOLATES EXECUTIVE ORDERS 11644 AND 11989

82.     Plaintiffs hereby reallege and incorporate all previous paragraphs as if set forth in full.

83.     The FEIS and ROD violated Executive Order 11644[1] by failing to assess the effects of snowmobile use on wildlife and other forms of winter recreation, and by failing to take steps to minimize those impacts, before designating approximately 60 percent of the BDNF to snowmobile use in the Revised Forest Plan and displaying these areas on a Winter Recreation Allocation Map.

84.     For example, the BDNF failed to evaluate and to minimize impacts from snowmobile use within the Hellroaring Basin/Mount Jefferson MA.

---

[1] A failure to comply with the terms of the Executive Orders is itself reviewable under the APA. *See Conservation Law Foundation of New England, Inc. v. Secretary Clark*, 590 F. Supp. 1467, 1477 (D. Mass. 1984) (holding that Order 11644 is "invested with the status of law" and enforceable), *aff'd*, 864 F.2d 954 (1st Cir. 1989).

24

85.     For the reasons alleged herein, the FEIS prepared for the Revised

Forest Plan is unlawful, arbitrary and capricious and an abuse of discretion in

violation of Executive Order 11644, as amended, and the APA.

## THIRD CLAIM FOR RELIEF – SUBPART C OF THE TMR IS
## INCONSISENT WITH EXECUTIVE ORDERS 11644 AND 11989

86.     Plaintiffs hereby reallege and incorporate all previous paragraphs as

if set forth in full.

87.     The portion of Forest Service regulation 36 C.F.R. part 212 (the

"Travel Management Rule" or "TMR") that regulates snowmobiles is inconsistent

with the requirements of the Executive Orders.

88.     All regulations promulgated by federal agencies must be consistent

with the authority granted to the agency to establish the regulations, in this case the

Executive Orders.

89.     The TMR contains the same definition for off-road vehicles as the

Executive Orders, under the term "off-highway vehicle."

90.     Snowmobiles were re-classified in the TMR as over-snow vehicles

("OSVs"), and defined as "a motor vehicle that is designed for use over snow and

that runs on a track or tracks and/or a ski or skis, while in use over snow."

91.     Over-snow vehicles were excluded from the designation criteria

required under the TMR that is applicable when the Forest Service designates

25

roads, trails or areas for wheeled off road vehicle use. Instead, the OSV provision, 36 C.F.R. § 212.81(c ), states that "if the responsible official proposes *restrictions or prohibitions* on use by over-snow vehicles under this subpart, the requirements governing designation of National Forest System roads, National Forest System trails, and areas on National Forest System lands in §§ 212.52, 212.53, 212.54, 212.55, 212.56, and 212.57 shall apply to establishment of those restrictions or prohibitions." *Id.* (emphasis added)

92.     Since the TMR under 36 C.F.R. § 212.81 only applies its designation criteria to "restrictions or prohibitions" of OSV use, the rule is not consistent with its authorizing authority that requires the promulgation of regulations designating off-road vehicle use "based upon the protection of the resources of the public lands, promotion of the safety of all users of those lands, and minimization of conflicts among the various uses of those lands." Executive Order 11644, Section 3. In fact, in the appeal response, the BDNF admitted its failure to use the TMR's designation criteria:

> Forest Service directives at Forest Service Manual (FSM) 7718.1 implementing the new travel management regulations clarify that over-snow vehicle use may be restricted or prohibited under 36 CFR 212.81 and 261.14, which require compliance with the designation process at 36 CFR 212.52 through 212.57, or through issuance of an order under 36 CFR Part 261, Subpart B, which does not require compliance with 36 CFR 212.52 through 212.57. Appeal decision 95.

26

93.     Due to this flaw in the TMR, the BDNF did not need to use the

designation criteria of the TMR—and therefore the requirements of the EOs—

when it designated areas for over-snow vehicle use in the Revised Forest Plan,

thereby demonstrating the TMR's failure to meet the Executive Orders'

requirements.

94.     As applied herein the portions of the TMR that exempt designation of

snowmobiles from the requirements of the Executive Orders are arbitrary,

capricious, unlawful and an abuse of discretion in violation of the APA because

they are inconsistent with their authorizing authority. Those portions of the TMR

are therefore void. The different treatment of over-snow vehicles from other off-

road vehicles is not justified and violates the plain language of the Executive

Orders.

## VII. REQUEST FOR RELIEF

Therefore, Plaintiffs respectfully request that this Court:

95.     Declare that the Forest Service's decision to permit snowmobile use

on approximately 60 percent of the BDNF violated NEPA, the APA, and

Executive Orders and remand the same to the Defendants;

96.     Direct the Forest Service to produce a Winter Travel Plan that meets

Executive Order and NEPA requirements.

97.     Declare that the portions of the TMR that exempt the Forest Service

from analyzing the effects of snowmobile use before designating areas to such use

are inconsistent with the authorizing authority and therefore unlawful and void;

98.     Remand the portion of the TMR that addresses OSV to the

Defendants to promulgate regulations that are in full compliance with all

applicable laws and regulations;

99.     Enter appropriate injunctive relief to insure protection of wildlife

and quiet recreation consistent with the allegations herein to insure that no

irreparable harm occurs while the Defendants revise their Revised Forest Plan and

conduct further winter travel planning;

100.    Award Plaintiffs their reasonable fees, costs, and expenses,

including attorneys' fees associated with this litigation; and

101.    Grant Plaintiffs such further and additional relief as the Court may

deem just and proper.

Dated this _____ day of September, 2010.


Jack R. Tuholske
Attorney for the Plaintiff