IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

MISSOULA DIVISION

| | | |
|---|---|---|
| WILDLANDS CPR, INC., FRIENDS OF THE BITTERROOT, INC., MONTANANS FOR QUIET RECREATION, INC. | ) ) ) ) ) | CV 10-104-M-DWM |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | ORDER |
| UNITED STATES FOREST SERVICE, LESLIE WELDON, in her official capacity as the Regional Forester fo Region 1, GLORIA MANNING, in her official capacity of the appeal deciding officer for the Chief of the Forest Service, DAVE MEYER, in his official capacity as Forest Supervisor for the Beaverhead Deerlodge National Forest | ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) ) | |
| and | ) ) ) | |
| MONTANA SNOWMOBILE ASSOCIATION, and IDAHO STATE SNOWMOBILE ASSOCIATION | ) ) ) ) | |
| Intervenor-Defendants | ) ) | |

**FILED**

APR 0 2 2012

PATRICK E. DUFFY, CLERK

By_____
DEPUTY CLERK, MISSOULA

-1-

# I. Introduction

The Beaverhead-Deerlodge National Forest ("the Forest"), covering 3.35 million acres, is the largest national forest in Montana. (Record of Decision for the Final Environmental Impact Statement and Revised Land and Resource Management Plan for the Beaverhead-Deerlodge National Forest ("ROD # 1") I1-01, 4.) It provides habitat for diverse species of plants and wildlife, contains many resources, and offers various recreational opportunities which contribute to local economies. (*Id.* at 4–5.) Recreational activities in the Forest include both motorized and non-motorized travel in the summer and winter. (*Id.* at 13–15.)

The parties to this case disagree about whether the United States Forest Service adequately analyzed the impacts of winter motorized travel[1] when developing the Final Revised Land and Resource Management Plan for the Beaverhead-Deerlodge National Forest ("Revised Forest Plan"). Plaintiffs seek review of the issues under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706. They insist the Forest Service violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.* by failing to adequately address site-specific impacts of snowmobiling on wildlife, on the environment, and on

---

[1]The terms "snowmobile," "over-snow vehicle," and "winter motorized travel" are used interchangeably throughout this memo, the parties' briefs, and the administrative record.

quiet recreation. The premise of their argument is the substantial increase in snowmobile use in the Beaverhead-Deerlodge National Forest in the past twenty-five years and the increased capability of snowmobiles to access steeper, more remote terrain. (Pls.' Mot. Summ. J., dkt #59, 1.)

They also argue the Forest Service violated Executive Orders 11644 and 11989 by failing to analyze criteria intended to minimize off-road vehicle impacts when selecting winter motorized travel areas. In the last prong of their challenge, Plaintiffs claim the Travel Management Rule, 36 C.F.R. 212.1 *et seq.* Subpart C, promulgated by the Forest Service in November 2005, should be set aside insofar as it exempts over-snow vehicles from mandatory route designation. They reason this exemption is inconsistent with Executive Orders 11644 and 11989.

Defendants take issue with Plaintiffs' positions and insist there are several justified defenses to their decision making. First, they contend Plaintiffs lack standing to bring these claims and maintain Plaintiffs failed to exhaust administrative remedies. They then argue NEPA does not require the level of site-specific analysis insisted on by Plaintiffs and that the Forest Service adequately analyzed snowmobiling impacts under NEPA. They conclude by insisting that Executive Orders are not subject to private action, that the Forest Service acted consistently with the Executive Orders, and that Subpart C of the 2005 Travel

Management Rule complies with the Executive Orders.

Intervenors join Defendants' arguments but they reason Plaintiffs' challenges are time-barred because any injury is traceable to prior forest plans, not the Revised Forest Plan. They also maintain that Plaintiffs' facial challenge to Subpart C of the Travel Management Rule is not ripe because the Forest Service did not avail itself of the snowmobile exemption and in fact applied the Executive Orders' minimization criteria in designating areas open to winter motorized travel.

For the reasons stated below, Plaintiffs' motion for summary judgment is granted as to standing, statute of limitations and as to the limited claim that the Forest Service failed to adequately analyze the minimization criteria at the route-specific level as required by Executive Order 11644 insofar as the Forest Service has designated specific routes. Defendants' and Intervenors' cross-motions for summary judgment are granted on all other issues. This means the case is remanded to the Forest Service for the limited purpose of applying E.O. 11644 at the route-specific level.

## II. Factual Background

The Beaverhead-Deerlodge National Forest was formed in 1996 when two national forests and their respective forest plans were consolidated for administrative purposes. (Corrected Final Environmental Impact Statement,

Beaverhead-Deerlodge National Forest Land and Resource Management Plan

("CFEIS") A1-40, 1.) The Beaverhead National Forest Plan and the Deerlodge

National Forest Plan had been approved in 1986 and 1987 respectively. They

were later modified by the Forest Service; in particular, additional areas were

closed to public motorized use. (CFEIS, 1, 23; Defs.' SUF, ¶ 7.)

In 2002, the Forest Service initiated the extensive process of revising the

consolidated forest plans. (CFEIS, 10.) A Proposed Action for Forest Plan

Revision was first published in August 2003 (A1-04), and then in June 2005, the

Forest Service released the Draft Environmental Impact Statement and Forest Plan

for public comment. (CFEIS, 559.) The draft EIS triggered 11,188 comments.

(ROD # 1, 2.) In February 2008, the Forest Service published the Final

Environmental Impact Statement; it sparked 32,536 more comments. (Final

Environmental Impact Statement, A1-26; ROD # 1, 2.) The Revised Forest Plan

was then approved on January 12, 2009 in a Record of Decision (ROD #1) signed

by then-Regional Forester Thomas L. Tidwell. (ROD # 1, 42.) The Corrected

Final Environmental Impact Statement was also released at that time. (CFEIS, 1.)

"Recreation and travel management" was one of eight topics addressed

throughout the revision process. Explaining the reason this issue needed attention,

the Forest Service observed:

Motorized recreation, particularly the use of ATV's and over-snow vehicles, has increased substantially since the 1986 and 1987 Plans were approved. Advancing technology has also expanded use into new terrain. For much of the [Beaverhead-Deerlodge National Forest], this use has evolved over time with little management intervention. The unmanaged expansion of motorized use has resulted in resource damage, wildlife impacts, and competition and conflict between user groups.

(ROD # 1, 13.) The Forest Service's fundamental job was to decide where to

allow summer motorized travel and where to allow winter motorized travel. It

tried to reduce the negative impacts of motorization while still providing

opportunities for motorized use of the Forest.

The Revised Forest Plan closed more of the Forest to snowmobiles than had

previously been closed.[2] The new plan prohibits winter motorized travel in 40%

of the Forest. (ROD # 1, 15.) Under the old plans,[3] winter motorized travel was

forbidden in only 16% of the Forest. (CFEIS, 39.)

### III. Summary Judgment Standard

A party is entitled to summary judgment if it can demonstrate "that there is

_____

[2] The February 2010 Record of Decision Enacting Forest Plan Travel Management Direction for Certain Areas of the Beaverhead-Deerlodge National Forest ("ROD # 2") implemented the Revised Forest Plan closures, closing 1,336,628 acres of the Forest to snowmobiles. (ROD # 2, J1-01.)

[3] Throughout the revision process, the Forest Service considered six alternatives for the Revised Forest Plan. Alternative 1, the "No Action Alternative," represented the "status quo"—the consolidated forest plans as they had been modified by administrative adjustments, litigation decisions, more accurate GIS information, and eleven forest plan amendments. (CFEIS, 23–24.)

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is warranted where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). On a motion for summary judgment, the task is to determine whether a fair-minded fact-finder could return a verdict for the non-moving party. *Id.* at 252. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude entry of summary judgment; factual disputes which are irrelevant or unnecessary to the outcome are not considered. *Id.* at 248.

## IV. Analysis

### A.    Standing and Statute of Limitations

Plaintiffs have established standing to sue through the affidavits of members who have a particularized interest in specific subareas of the Forest that are affected by the Revised Forest Plan. *See Summers v. Earth Is. Inst.*, 555 U.S. 488, 496-99 (2009). They allege the Revised Forest Plan harms their interests. They need not produce affidavits alleging interests in all affected subareas of the Forest. *See Nuclear Info. & Resource v. Nuclear Reg. Commn.*, 457 F.3d 941 (9th Cir. 2006). Nor need they find an affiant to allege an interest in each environmental impact. *See Forest Serv. Employees for Envtl. Ethics v. U.S. Forest Serv.*, 726 F.

-7-

Supp. 2d 1195, 1222 (D. Mont. 2010).

That less area of the forest is open to snowmobiling now than was open under the previous plans does not impact Plaintiffs' standing. *See Douglas Co. v. Babbitt*, 48 F.3d 1496, 1506, n. 13 (9th Cir. 1995); *Natl. Wildlife Fedn. v. Espy*, 45 F.3d 1337, 1341, n. 3 (9th Cir. 1995). This case is distinguishable from *Pryors Coalition v. Weldon*, 803 F. Supp. 2d 1184 (D. Mont. 2011), because *Pryors* did not discuss standing and because NEPA compliance is statutorily required for a revised forest plan, even if it merely continues in effect decisions from previous plans. *See* 16 U.S.C. § 1604(f)(5). When a decision to continue a previous decision is part of a final agency action, it is reviewable by the courts and the clock for the six-year statute of limitations is reset. *See* 28 U.S.C. § 2401(a); *see also Wind River Mining Corp. v. United States*, 946 F.2d 710, 712-13 (9th Cir. 1991).

## B. Motion to Strike

During the course of litigation, Defendants were required to "certify and file the administrative record no later than February 22, 2011." (Dkt # 16, 2.) That record Order also stated that "[m]otions to supplement or challenge the contents of the Administrative Record shall be filed no later than March 15, 2011." (*Id.*) Defendants have seemingly ignored the order and have supplemented the record

several times since March 15, 2011. Plaintiffs now want to strike one of those supplements.[4] The request is to strike the Third Declaration of Jan Bowey ("Third Declaration") as well as the two exhibits attached to that document. The exhibits list the various landscapes in the Forest, as well as notations that identify the rationales the Forest Service relied upon for its decision regarding each landscape. Specifically, Bowey states that "Exhibit A is a table with handwritten numbers identifying the reasons for including certain landscapes as winter nonmotorized in Alternative 6." (*Id.*)

There is "broad discretion in supervising the pretrial phase of litigation." *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607 (9th Cir. 1992). Conceivably the Forest Service's filing could be viewed as a motion to modify the scheduling order and to supplement the record. The Declaration of James O'Neil as well as the Third and Fourth Declarations of Jan Bowey might support a finding that the Service had good cause to move to supplement the record late. Additionally, Exhibit A is relevant to the question of "whether the agency considered all relevant factors or fully explicated its course of conduct or grounds of decision," *Friends of the Earth v. Hintz*, 800 F.2d 822, 829 (9th Cir. 1986), and

---

[4]The Plaintiffs have not objected to any of the other supplements filed by the Defendant after March 15, 2011. Thus, all such supplements are deemed unobjectionable and stipulated to by the parties.

it suggests the agency "relied on documents not in the record," *Fence Creek Cattle Co. v. U.S. Forest Serv.*, 602 F.3d 1125, 1131 (9th Cir. 2010). However, as is evident throughout this order, Exhibit A is not necessary to the decision, so its omission from the record is harmless. *See e.g. Portland Audubon Socy.*, 984 F.2d at 1548; *Cabinet Resource Group v. U.S. Forest Serv.*, 2004 WL 966086 at *11 (D. Mont. March 30, 2004). Accordingly, it is unnecessary to construe Forest Service's late filing as a motion to modify the scheduling order and to supplement the record. *Johnson*, 975 F.2d at 608 (noting a "court may deny as untimely a motion filed after the scheduling order cut-off date where no request to modify the order has been made.")(citation omitted). The Third Declaration of Jan Bowey and two attached exhibits are stricken.

## C. Exhaustion

Defendants reason that because Plaintiffs have failed to exhaust their administrative remedies as to their NEPA claims regarding effects on air quality, water quality and mountain goats, these claims should be dismissed. Plaintiffs insist that they have met the exhaustion requirement because these issues were raised by others during the comments period (specifically Montana Fish, Wildlife and Parks (MFWP) and the Environmental Protection Agency (EPA)).

"[A] person shall exhaust all administrative appeal procedures established

-10-

by the Secretary [of Agriculture] or required by law before the person may bring an action in a court of competent jurisdiction against . . . an agency, office, officer, or employee of the Department." 7 U.S.C. § 6912(e)(3). *See* 36 C.F.R. § 215.21. The purpose of exhaustion is to allow the agency to "correct its own errors through administrative review." *Johnson v. Shalala*, 2 F.3d 918, 922 (9th Cir. 1993). Although the exhaustion requirement of 7 U.S.C. § 6912(e) applies to claims brought before the Forest Service, it is not jurisdictional. *McBride Cotton & Cattle Corp. v. Veneman*, 290 F.3d 973, 976 (9th Cir. 2002).[5]

Exhaustion of administrative remedies for any issue, means the issue has to be raised on administrative appeal "with sufficient clarity to allow the decision maker to understand and rule on the issue raised." *Idaho Sporting Cong., Inc. v. Rittenhouse,* 305 F.3d 957, 965 (9th Cir. 2002). An issue may be raised by general terms rather than precise legal terms. *Id.* However, "claims raised at the administrative appeal and in the federal complaint must be so similar that the district court can ascertain that the agency was on notice of, and had an

---

[5] Plaintiffs mistakenly attempt to frame the issue as one of "issue preclusion" as opposed to exhaustion. However, compliance with the exhaustion statute is mandatory unless the claim can be shown to be "(1) collateral to a substantive claim of entitlement, (2) colorable, and (3) one whose resolution would not serve the purposes of exhaustion." *McBride Cotton & Cattle Corp.*, 290 F.3d at 980 (quoting *Anderson v. Babbitt*, 230 F.3d 1158, 1163 (9th Cir. 2000)). Such a showing has not been made here.

-11-

opportunity to consider and decide, the same claims now raised in federal court."

*Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 899 (9th Cir.

2002)(quoting *Kleissler v. U.S. Forest Serv.*, 183 F.3d 196, 201-202 (1999)

("[m]ere vague references or conclusory statements do not meet the statutory

requirements" for administrative exhaustion)).

### 1.    Plaintiffs cannot rely on third party comments to satisfy the exhaustion requirement.

In this case Plaintiffs raised their water and air quality claims for the first

time in a footnote on administrative appeal. (I2-23, 5 n. 2).  Similarly, they did not

raise their mountain goat claim on administrative appeal other than to use the term

"mountain goats."  However, the EPA and MFWP commented on these three

issues during the comments period of the administrative appeals process.  (Pl.'s

SOF at ¶¶ 10, 20, 22-23.)

If the comments of third parties are not considered, the issues of water

quality, air quality and mountain goats were not raised with "sufficient clarity"

during the administrative appeals process. *Idaho Sporting Cong.*, 305 F.3d at 965.

In *Idaho Sporting Congress*, the court held that the plaintiffs had failed to meet the

exhaustion requirement when they "fail[ed] to point out where in the record they

raised this issue before the Forest Service." *Id.*  However, that court also noted

-12-

that it was "unable to locate *any* reference to [the] claim in the administrative record." *Id.* (emphasis added). In this case, the record references the particular issues through the comments of the EPA and MFWP.

Relying on *Kern v. Bureau of Land Management*, 38 F. Supp. 2d 1174 (D. Or. 1999), Plaintiffs reason that third party comments can be used to meet the requirements of the exhaustion statute. The *Kern* case is distinguishable from the facts here. The district court in *Kern* found that as long as the agency has had an opportunity to consider an issue, "it has no reason to challenge the bringing of such [issue] before a court by another party." 38 F. Supp. 2d at 1180. However, the plaintiffs in *Kern* were suing the Bureau of Land Management, an agency not bound by the 7 U.S.C. § 6912(e) statute mandating exhaustion of administrative remedies. *Chattooga R. Watershed Coalition v. U.S. Forest Serv.*, 93 F. Supp. 2d 1246, 1251 (N.D. Ga. 2000). "Statutory exhaustion requirements implicate concerns of separation of powers and, therefore, the failure to comply with the requirements deprives [the court] of jurisdiction." *Marathon Oil Co. v. U.S.*, 807 F.2d 759, 768 (9th Cir. 1986) (finding that there was no statutory requirement for exhaustion because agency involved was the Department of Interior, which lacked an exhaustion statute).

Plaintiffs provide no authority where a court has held that third party

-13-

comments can be used by a different but discrete party to meet the exhaustion requirements under 7 U.S.C. § 6912(e). The plain language of the exhaustion statute precludes this assertion. The statute requires a "person" to have exhausted the administrative appeals process in order for "the person" to then bring a claim to a competent court. *Id.* Discrete comments by separate persons or entities do not meet this statutory requirement. It would be mistaken to construe 7 U.S.C. § 6912(e) to do so if such a construction violates the plain language of the statute itself. *Kleisser*, 183 F.3d at 202. Consequently Defendants' are entitled to summary judgment as to Plaintiffs' claims regarding air quality, water quality and mountain goats.

### 2. Plaintiffs' failure to appeal ROD #2 does not constitute a failure to exhaust administrative opportunities.

Finally, Defendants contend that because Plaintiffs failed to file an administrative appeal of ROD #2, they forfeited any further objections. The failure to file an appeal to ROD #2 is irrelevant. Plaintiffs' claims fall under ROD #1, which represents the substantive adoption of the Revised Forest Plan. ROD #2 only implemented the closures outlined in ROD #1. (ROD #2, J1-01.) Thus, Plaintiffs correctly appealed ROD #1.

## D. NEPA

### 1. Administrative Procedure Act Standard

"The reviewing court shall hold unlawful and set aside agency action that is

. . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with the law." 5 U.S.C. § 706(2)(A). The court's scope of review is narrow, and

should "not substitute its judgment for that of the agency." *Motor Veh. Mfrs.*

*Assn. v. St. Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Gardner v. U.S.*

*Bureau of Land Mgmt.*, 638 F.3d 1217, 1224 (9th Cir. 2011). A decision is

arbitrary and capricious:

> only if the agency relied on factors Congress did not intend it to
> consider, entirely failed to consider an important aspect of the problem,
> or offered an explanation that runs counter to the evidence before the
> agency or is so implausible that it could not be ascribed to a difference
> in view or the product of agency expertise.

*Gardner*, 638 F.3d at 1124 (quoting *Lands Council v. McNair*, 537 F.3d 981, 987

(9th Cir. 2008)).

The agency's actions are valid if it "examine[d] the relevant data and

articulate[d] a satisfactory explanation for its actions including a rational

connection between the facts found and the choices made." *Id.* (citation and

internal quotation marks omitted). Review of the agency's action is deferential,

"presuming the agency action to be valid." *Buckingham v. Secy. of U.S. Dept. of*

*Agric.*, 603 F.3d 1073, 1080 (9th Cir. 2010) (quoting *Irvine Med. Ctr. v.*

*Thompson*, 275 F.3d 823, 830-31 (9th Cir. 2002)). As long as the record supports

the agency's decision, that decision should be upheld even if the record could

support alternative findings. *Ark. v. Okla.*, 503 U.S. 91, 112-13 (1992).

Furthermore, it is acceptable to "uphold an agency decision of less than ideal

clarity if the agency's path may be reasonably discerned." *St. Farm Mutual Auto.*

*Ins. Co.*, 463 U.S. at 43. In doing so, a court "may not supply a reasoned basis for

the agency's action that the agency itself has not given." *SEC v. Chenery Corp.*,

332 U.S. 194, 196 (1947).

### 2.    NEPA Standard

NEPA is a procedural statute, intended to protect the environment by

fostering informed agency decision-making. *See Cal. ex. rel. Lockyer v. U.S.*

*Dept. of Agric.*, 575 F.3d 999, 1012 (9th Cir.2009). NEPA "does not mandate

particular results, but simply provides the necessary process to ensure that federal

agencies take a hard look at the environmental consequences of their actions."

*High Sierra Hikers Assn. v. Blackwell*, 390 F.3d 630, 639 (9th Cir.2004)(citation

and internal quotation marks omitted). NEPA compels agencies to prepare a

detailed environmental impact statement ("EIS") for all "major Federal actions

significantly affecting the quality of the human environment." 42 U.S.C. §

-16-

4332(C); *see Hapner v. Tidwell*, 621 F.3d 1239, 1244 (9th Cir. 2010). "An EIS may be found inadequate under NEPA if it does not reasonably [set] forth sufficient information to enable the decision maker to consider the environmental factors and make a reasoned decision." *Half Moon Bay Fishermans' Mktg. Assn. v. Carlucci*, 857 F.2d 505, 508 (9th Cir. 1988).

The "rule of reason" is applied to determine whether an EIS contains a "reasonably thorough discussion of the significant aspects of probable environmental consequences." *Neighbors of Cuddy Mt. v. U.S. Forest Serv.*, 137 F.3d 1372, 1376 (9th Cir. 1998). The standard of review is deferential, and should not substitute judicial views for that of the agency "concerning the wisdom or prudence of a proposed action." *City of Carmel-by-the-Sea v. U.S. Dept. of Transp.*, 123 F.3d 1142, 1150 (9th Cir. 1997)(quoting *Or. Envtl. Council v. Kunzman*, 817 F.2d 484, 492 (9th Cir. 1987)). "Once satisfied that a proposing agency has taken a 'hard look' at a decision's environmental consequences, [the court's] review is at an end." *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1519 (9th Cir. 1992). However, when a determination is made that an EIS fails to comply with the requirements of NEPA, the court shall "hold unlawful and set aside agency action, findings, and conclusions" that are "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

-17-

### 3. NEPA does not require the more detailed, site-specific level of analysis demanded by Plaintiffs.

Plaintiffs claim that the Forest Service violated NEPA when it did not evaluate the "site-specific impacts" snowmobiles would have on wildlife and other recreational activities. According to Plaintiffs, under the *Half Moon Bay* "reasoned decision" analysis, the Service had to examine each area or each trail where snowmobiling was proposed, determine what resources would be affected, and then evaluate the impacts. The question here is whether NEPA requires a more detailed level of site-specific analysis of snowmobile impacts than the Forest Service's landscape level analysis that was used.

Defendants hold the view that the agency does not need to evaluate "every conceivable environmental impact" at the site-specific level. *See No GWEN Alliance of Lane Co., Inc. v. Aldridge,* 855 F.2d 1380, 1385-86 (9th Cir. 1988). While there may be some merit to their assertion, their reliance on *Aldridge* is misplaced. *Aldridge* involved an environmental assessment ("EA") issued by the Air Force concerning the construction of radio towers necessary to protect the nation from nuclear attack. The *Aldridge* court held that the EA need not consider the potential environmental impacts of nuclear war based on the attenuated link between the radio tower project and that potential impact. *Id.* This type of

-18-

attenuation was also considered in *Warm Springs Dam Task Force v. Gribble*, where the Court held that the environmental impacts resulting from a possible dam failure caused by a catastrophic earthquake did not need to be discussed in the Army Corps of Engineers's EIS. 621 F.2d 1017 (9th Cir. 1980). These cases have limited persuasiveness because the situation here involves the direct environmental impact of snowmobiles under the Revised Forest Plan, not an "attenuated link" to such an impact.

There is no bright line of specificity for an EIS; rather a review must "make a pragmatic judgment whether the EIS's form, content and preparation foster both informed decision-making and informed public participation." *St. of Cal. v. Block*, 690 F.2d 753, 761 (9th Cir. 1982); *Idaho Conservation League*, 956 F.2d at 1519. Generally there is deference to the Forest Service's "identification of the geographic area" in which environmental impacts may occur. *See Kleppe v. Sierra Club*, 427 U.S. 390, 413-14 (1976). However, NEPA requires an agency to explain in the EIS how it chose the scope of the geographic area in which it conducted cumulative impact analysis and it must demonstrate that in making that choice it considered the relevant factors. *Native Ecosystems Council*, 304 F.3d at 902; *see Wetlands Action Network v. U.S. Army Corps of Engrs.*, 222 F.3d 1105, 1114 (9th Cir. 2000). "The detail that NEPA requires in an EIS depends on the

nature and scope of the proposed action." *Block,* 690 F.2d at 761 (citing *Aberdeen & Rockfish R.R. Co. v. Students Challenging Reg. Agency Procs.,* 422 U.S. 289, 322 (1975)). Other factors may include "the features of the land[] and the types of species in the area." *Selkirk Conservation Alliance v. Forsgren,* 336 F.3d 944, 958 (9th Cir. 2003). The magnitude of the potential task does not excuse an absence of reasonably thorough site-specific analysis. *Block,* 690 F.2d at 765 (decision concerned 62 million acres of National Forest Service Land and a national, rather than a forest-specific, planning document).

The project in question involves the creation of a forest plan for the combined Beaverhead-Deerlodge Forest, an area covering over 3 million acres. The Forest is divided into twelve landscapes, which are further divided into unique management areas. The twelve landscapes are: Big Hole, Boulder River, Clark Fork-Flints, Elkhorn, Gravelly, Jefferson River, Lima Tendoy, Madison, Pioneer, Tobacco Roots, Upper Clark Fork, and Upper Rock Creek. (Revised Forest Plan, 63.) According to the Forest Service,

> A landscape is a large area of land (as much as 1,000,000 acres) that represents either a mountain range or a whole watershed basin. These areas reflect logical blocks of land that people relate to by name – large blocks of land where people, wildlife, water and natural processes move with some predictability. Landscapes in Montana tend to be isolated mountain ranges and the valley bottoms around them.

(L2-01, I-1.) The Forest Service analyzed a wide range of conditions in each landscape, including, but not limited to, vegetation conditions and changes, key wildlife habitats, watershed condition, and recreation use patterns. (*Id.*) The Northern Region of the Forest Service determined in 1995, "as part of its ecosystem management philosophy, to base revisions of the National Forest Land Management Plans (Forest Plans) on 'landscape areas.'" (*Id.* at I-2.) The project here is a manifestation of that philosophy.

In *Idaho Sporting Congress, Inc.*, the Ninth Circuit found that the Forest Service's decision to use a "home range" or "habitat" level analysis over that of a "landscape" analysis was arbitrary and capricious. 305 F.3d at 974. There the Forest Service ignored its own scientific conclusions that the cumulative effects analysis needed to be addressed at the landscape level due to the habitat needs of the specific species at issue. *Id.* at 973 (regarding lynx, wolverine, fisher, boreal owl, goshawk, flammulated owl, and white-headed woodpecker). While this does not mean that a landscape-level analysis is always the correct measure for analysis, it does show that the approach is preferable in some wildlife habitat situations.

The questioned project here has a smaller scope than the Forest Service project in the *Block* case. In *Block*, the Court determined that the Forest Service needed to perform site-specific analysis in the areas it wanted to declare "non-

-21-

wilderness" among the 62 million acres in question. 690 F.2d at 757. The Circuit found that the indices the Forest Service use in *Block* were too generalized, lumping together unique wilderness areas and failing to mention wildlife types or quantities in these areas. *Id.* at 763. In this plan, the landscape areas used by the Forest Service generally include one mountain range area, and considers the unique nature of the landscape and the potential wildlife habitats in that area. Here the Forest Service did not make the sweeping generalizations that the *Block* court determined violated NEPA.

Using landscape scale, the Forest Service specifically analyzed the percentages of big game range (CFEIS, 510, Table 176) and wolverine denning habitats (*id.* Table 177) that would be impacted by motorized winter vehicle use. It also mapped out motorized and non-motorized winter recreation allocations based on each alternative. (CFEIS, 69-74.) The record demonstrates it included quantified and detailed information regarding what areas are inhabited by wildlife and in what areas snowmobile use will have the greatest impact. *See Neighbors of Cuddy Mt.*, 137 F.3d at 1379. The record here shows the Service has adequately explained how it chose the landscape level as the appropriate scale for site-specific analysis and has demonstrated it considered relevant factors in making that decision. *Selkirk Conservation Alliance*, 336 F.3d at 958.

Plaintiffs look to a portion of the record that states that landscape-level analysis does not "replace a site specific analysis." (L2-01, 6.) The Forest Service does not state that a more detailed site-specific analysis is necessary or better in this situation, only that the landscape analysis employed may be insufficient when more detailed site-specific analysis is found to be required. Neither the Forest Service nor Plaintiffs provide scientific evidence that more detailed analysis would have been preferential in this case or that it would have resulted in more "detailed information regarding significant environmental impacts." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). Plaintiffs also fail to show that the Forest Service "failed to consider an important aspect of the problem" or "offered an explanation [for using landscape-level analysis] that runs counter to the evidence." *Gardner*, 638 F.3d at 1124.

Based on the foregoing, the Forest Service was not arbitrary or capricious in its adoption of a landscape-level analysis. The record demonstrates that the Forest Service examined relevant data and articulated a satisfactory explanation for its subsequent decisions.

### 4. The Forest Service sufficiently analyzed potential effects on wildlife.

#### a. Big Game Winter Range

Plaintiffs contend that Table 176 of the CFEIS, which depicts the percentage of winter range that is off-limits to snowmobiles under the various alternatives is insufficient to determine the impacts snowmobile use will have on big game range. Plaintiffs maintain that the Forest Service's general data about elk populations and winter range fails to address where the winter range is located, when elk use the winter range, and how many elk might be displaced by snowmobile use.

The argument is unconvincing because even though the Forest Service's analysis lacks clarity, its "path can be reasonably discerned." *St. Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43. The CFEIS addresses each of the factors the Plaintiffs insist should be addressed. First, in Table 176, the Forest Service designates the percentage of big game winter range closed to winter motorized travel by individual landscape area. (CFEIS, 510.) Inherent in this information is the location of winter range in and among the individual landscape areas. Second, the Forest Service provides the number of elk contained in the 29 hunting districts that fall entirely or partially within the Forest's boundaries. (*Id.* at 491, Table 169).

These hunting units are smaller than the landscapes and show within those landscapes where elk populations are located. Finally, the record establishes the use of scientific data regarding the flight response big game will likely have when exposed to snowmobile use. (*Id.* at 513-14, Table 179.) The Service performed this "flight response" analysis for each alternative, so it was necessarily aware of the different levels of the impact between the designated alternatives.

Additionally, the record shows that the Forest Service conferred with MFWP in deciding to use a hunting scale when looking at big game ranges (*Id.* at 901-02). It points to many instances throughout the record where it responded to comments in this area. Similarly, the record demonstrates that the Forest Service considered how winter motorized travel might impact riparian areas and other habitat upon which moose depend in each landscape under each alternative. (CFEIS, 136, 479.) This information provided the Forest Service with sufficient information regarding big game to make a "reasoned decision." *Half Moon Bay*, 857 F.2d at 508. Thus, the Forest Service met NEPA requirements in its analysis of big game.

### b.    Wolverines

Plaintiffs stress, and the Forest Service agrees, that with the continuing development of winter recreation technology, snowmobiles can go deeper into the

Forest and into steeper terrain than ever before. Plaintiffs concede that the Forest

Service performed some analysis regarding snowmobile impacts on wolverine

denning, but reason that this overlooked an important potential impact: wolverine

habitat connectivity. Plaintiffs insist that this is a failure to consider a relevant

factor as required by *State Farm Mutual Automobile Insurance Company.*

The argument unconvincing for at least three reasons. First, the Forest

Service made a "reasoned decision" based on detailed analysis regarding

wolverine denning sites. (*Id.* at 512-513). Second, the Forest Service recognized

and considered the necessity of habitat connectivity. (*Id.* at 535-539). Finally, the

Ninth Circuit has previously found that based on the Forest Service's own

scientific evaluation, the landscape level of analysis was preferable over the home-

range level when addressing environmental impacts on wolverine populations.

*Idaho Sporting Congress, Inc.*, 305 F.3d at 973. As a consequence, the Circuit

determined that the Forest Service acted arbitrarily and capriciously when it used

the home-range scale, ignoring a 1996 Forest Service Report that mandated that

"the habitat needs of [the] species *must be evaluated at a landscape scale.*" *Id.*

(emphasis in original). Here, the Forest Service had similar scientific evidence

regarding the large home range occupied by wolverines (CFEIS, Appx. B, BE-96),

but it would have fatally ignored its own science had it decided to perform a

home-range analysis instead of choosing the course it did.

The Forest Service took into account the relevant factors in its analysis of snowmobile impacts on wolverine habitats under the Revised Forest Plan.

## 5. The Forest Service sufficiently analyzed potential effects on other recreational uses.

Plaintiffs next contend that the Service did not provide sufficient analysis of the conflicts between snowmobilers and quiet recreationists in designated high use areas. The criticism focuses largely on the Mount Jefferson area, where they claim the agency drew an imaginary line separating snowmobile use and other recreational use. The record shows that this partition was the result of the Forest Service's analysis of conflicting uses and was based on public comments. (CFEIS, 381.)

The Forest Service weighed competing interests in the Mount Jefferson area and determined that a partition based on proximity to the BLM Centennial Wilderness Study Area and special wolverine areas would create the best balance. (*Id.*) It is an impermissible claim to reason that because they did not get the result they desired, the Forest Service violated NEPA. Criticism of agency decisions does not undermine the validity of an EIS. *See Havasupai Tribe v. Robertson,* 943 F.2d 32, 34 (9th Cir.1991). Thus, the Service complied with NEPA regarding

-27-

impacts on other recreational uses.

Defendants' motion for summary judgment is granted as to Plaintiffs' claims under NEPA.

## E. Executive Orders 11644 and 11989

Issued by President Nixon in 1972, Executive Order 11644 ("E.O. 11644") defines "off-road vehicle" ("ORV") as "any motorized vehicle designed to be capable of cross-country travel on or immediately over land, water, sand, snow, ice, marsh, swampland, or other natural terrain." 37 Fed. Reg. 2877, § 2(3) (February 8, 1972). In 1977, President Carter issued Executive Order 11989 ("E.O. 11989"), "strengthen[ing E.O. 11644] considerably." 42 Fed. Reg. 26,959 (May 24, 1977). E.O. 11989 directs an agency to close certain trails and other areas upon a finding that ORV use "will cause or is causing considerable adverse effects on the soil, vegetation, wildlife, wildlife habitat or cultural or historic resources of particular areas or trails of the public lands." *Id.* at § 2. These areas are then to remain closed until the agency "determines that such adverse effects have been eliminated and that measures have been implemented to prevent future recurrence." *Id.*

## 1. Executive Orders 11644 and 11989 are subject to a private right of action.

Executive orders are generally not subject to a private right of action *See*

*Chai v. Carroll*, 48 F.3d 1331, 1338-39 (4th Cir. 1995); *see also Facchiano*

*Constr. Co. v. U.S. Dept. of Labor*, 987 F.2d 206, 210 (3d Cir. 1993). Even so, an

executive order can be found to provide such a right if (1) the "order does not

preclude judicial review" and (2) "there is 'law to apply.'" *City of Carmel-by-the-*

*Sea*, 123 F.3d at 1166. Here, E.O. 11644 does not preclude judicial review and

NEPA is the applicable law.

"Presidential proclamation and orders have the force and effect of laws

when issued pursuant to a statutory mandate or delegation of authority from

Congress." *Indep. Meat Packers Assn. v. Butz*, 526 F.2d 228, 234-35 (8th Cir.

1975) (determining that an order lacked the force and effect of law because it did

not cite specific authority other than the "Constitution and laws of the United

States."); *see also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 597-99

(1952) (limiting the President's ability to act as a lawmaker in the absence of

authority or mandate from Congress).

In this case, E.O. 11644 specifically states that it was issued "in furtherance

of the purpose and policy of NEPA," explicitly establishing its underlying

congressional authority. *See, e.g., Romero-Barcelo v. Brown*, 643 F.2d 835, 859

(1st Cir. 1981) (holding that an executive order based on NEPA and the National

Historic Preservation Act had the force and effect of law); *Aluli v. Brown*, 437 F.

Supp. 602, 609 (D. Haw. 1977), *revd. on other grounds* 602 F.2d 876 (9th Cir.

1979) (holding that an executive order had the force and effect of law even though

"the President substantially expanded the mandate of" the National Historic

Preservation Act section applied). Thus, E.O. 11644, as amended by E.O. 11989,

has the force and effect of law.

In addition to demonstrating that the executive order has the force and effect

of law, Plaintiffs must show that the executive order was intended to create a

private right of action. *See Acevedo v. Nassau Co.*, 500 F.2d 1078, 1083-84 (2d

Cir. 1974). Private rights of action "may be inferred when necessary to effectuate

the purposes of a statute or regulation." *Id.* at 1084. However, where obligations

created by an executive order are broad and vague, a private right of action cannot

be inferred for fear of protracted lawsuits brought by "persons with little at stake."

*Id.*

In *Independent Meat Packers Association*, the Eight Circuit held Executive

Order 11821— which required consideration of inflation-related factors in the

grading of beef— was not created or meant to be implemented by the judiciary;

rather, the order merely reflected the President's personal economic policy. 526

F.2d at 236. In contrast, in *Aluli v. Brown*, the district court determined that

Executive Order 11593 was promulgated as an implementation tool of the

National Historic Preservation Act, not a "mere executive housekeeping tool" like

the order at issue in *Independent Meat Packers Association.* 437 F. Supp. at 609.

In *Legal Aid Society v. Brennan*, the Ninth Circuit upheld a plaintiff's challenge of

the government's alleged failure to consistently enforce an executive order

requiring the inclusion of affirmative action guarantees in public contracts. 608

F.2d 1319 (9th Cir. 1979). According to the Court,

> Appellees do no seek recognition of a supplemental private enforcement
> mechanism. They do not seek damages for specific acts of
> discrimination against themselves. They ask only that . . . government
> officials be required to perform the non-discretionary duties imposed
> upon them by the Executive Orders.

*Id.* at 1332.

E.O. 11644 is akin to the executive orders in *Aluli* and *Brennan* and

distinguishable from those in *Independent Meat Packers Association* and *Acevedo.*

Even though the *Aluli* court made its determination based on an executive order

that included National Historic Preservation Act, E.O. 11644 has a similar

relationship with NEPA. According to E.O. 11644,

> It is the purpose of this order to establish policies and provide for

procedures that will ensure that the use of off-road vehicles on public lands will be controlled and directed so as to protect the resources of those lands, to promote the safety of all users of those lands, and to minimize conflicts among the various uses of those lands.

§ 1. While this language does not specifically reference a private right of action, that is the only way to effectuate its stated purpose. *Aluli*, 437 F. Supp. at 609. It is unlikely that the Forest Service would challenge its own compliance with E.O. 11644. Similarly, as in *Brennan*, Plaintiffs' claims do not seek damages for specific acts against them, but seek to compel the Forest Service to adequately consider the requirements of E.O. 11644 before adopting its Revised Forest Plan.

E.O. 11644, as amended by E.O. 11989, may be enforced through a private right of action.

**2. The Forest Service adequately applied the minimization criteria required under Executive Orders 11644 and 11989 for areas generally open to snowmobile use. However, to the extent that the Forest Service designated specific routes for snowmobile use, it failed to apply the minimization criteria at the route-specific level.**

In 2005, the Forest Service acknowledged that E.O. 11644's definition of "off-road vehicles" included snowmobiles, stating:

Snowmobiles are "off-road vehicles" under Executive Order 11644 and subject to the direction "to provide for administrative designation for the specific areas and trails on public lands on which the use of off-road vehicles may be permitted, and areas in which the use of off-road vehicles may not be permitted."

-32-

70 Fed. Reg. 68, 273 (Nov. 9, 2005)(citing E.O. 11644, § 3(a)).

E.O. 11644 requires that areas and trails be located to minimize: (1) "damage to soil, watershed, vegetation, or other resources of the public lands"; (2) "harassment of wildlife or significant disruption of wildlife habitats"; and, (3) "conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors." § 3(a)(1-3). These criteria, known as the "minimization criteria," require federal agencies to minimize motorized impacts on public lands.

The initial question is whether the minimization criteria must be applied to each designated snowmobile route. The parties disagree about whether the Forest Service applied the minimization criteria when it developed the Revised Forest Plan. According to the court in *Idaho Conservation League v. Guzman*, besides documenting its consideration of the specified criteria, the Forest Service must explain "how the minimization criteria were applied in the route designation decisions." 2011 WL 447456, at *17 (D. Idaho Feb. 4, 2011); *see also Conservation Law Found. of New England, Inc. v. Clark*, 590 F. Supp. 1467, 1477 (D. Mass. 1984). "'Minimize' as used in the regulation does not refer to the number of routes, nor the overall mileage. It refers to the effects of route

-33-

designations." *Guzman*, *16.

This view is shared by a number of other courts. *Conservation Law Found. of New England, Inc. v. Secy. of the Interior*, 864 F.2d 954, 960 (1st Cir. 1989) ("The defendants considered the protection of natural values in arriving at the current regulations restricting ORV use on the Seashore. The extent and location of ORV trails were set under the 1985 Plan consistent with these values."); *Pryors Coalition*, 803 F. Supp. 2d at 1190 ("Defendants did analyses and gave consideration to the effects of their ROD on water quality, wildlife, recreation and noise, and archaeological and cultural resources. Further, Defendants not only identified each non-system route that they converted to a system route, they provided rationale as to why the road was converted."); *Clark*, 590 F. Supp. at 1481 (finding the "zones" established for ORV use met requirements under E.O. 11644).

Here, the Revised Forest Plan specifically closes *areas* of the Forest to snowmobiling that were of particular concern due to potential disruption of the environment, wildlife, and non-motorized recreational uses. (CFEIS, 20.) This focus on *area* designations as opposed to *route* designations appear premised on the notion that snowmobiles are not always confined to specific routes in open use areas. The text of E.O. 11644 implies this distinction by the use of the terms

-34-

"areas and trails." § 3.

The Forest Service specifically addressed how each alternative plan would affect relative percentages of wildlife population and habitat in these areas. (CFEIS, 507-12.) Defendants also establish that the Forest Service considered vegetation (*id.* at 479) and impacts on the watershed (I1-01, 14). Finally, the record shows that the Forest Service considered potential impacts on non-motorized recreational uses. (CFEIS, 359, 365-66.) To the extent that snowmobiles are allowed free rein in open use areas, the Forest Service's area-level application of the minimization criteria meets the requirements of E.O. 11644.

However, to the extent that specific routes have been designated for snowmobile use, Defendants fail to show that the Forest Service adequately applied the minimization criteria at the route-specific level. In this narrow instance, summary judgment is granted in favor of the Plaintiffs.

## F. 2005 Travel Management Rule Subpart C

Subpart C of the 2005 Motorized Travel Management Rule exempts over-snow vehicles from the general requirement that the Forest Service designate routes for motorized vehicles and comply with the requirements of 36 C.F.R. §§ 212.52–212.57. 36 C.F.R. §§ 212.51, 212.81. Only if restrictions on

snowmobiling are proposed must the Forest Service comply with §§
212.52–212.57 in planning for winter motorized travel.

The Defendants do not depend on the snowmobile exemption in Subpart C
of the Travel Management Rule to justify their actions. Thus, ripeness turns on
whether Plaintiffs can challenge the Travel Management Rule even if the
snowmobile exemption in question was not applied. The United States Supreme
Court has established a two-part test for determining ripeness: "first, a reviewing
court must ask if the issues are fit for judicial decision; and second, a reviewing
court considers the hardship to the parties of withholding review." *Earth Is. Inst.
v. Ruthenbeck*, 490 F.3d 687, 695 (9th Cir. 2007) *aff'd in part, rev'd on other
grounds by Summers*, 555 U.S. 488 (citing *Abbot Laboratories v. Gardner*, 387
U.S. 136, 149 (1967)).

An issue is fit for judicial decision if the regulation was the "final agency
action" and the question presented was of a purely legal nature. *Abbott
Laboratories*, 387 U.S. at 149-151. However, the Supreme Court teaches that a
purely legal question may not be ripe for judicial review if "the regulations' effects
were speculative and the record was incomplete." *Toilet Goods Assn. v. Gardner*,
387 U.S. 158, 164 (1967). *See Lujan v. Natl. Wildlife Fedn.*, 497 U.S. 871, 891
(1990) (holding that a regulation is generally not ripe for review "until . . . its

-36-

factual components [are] fleshed out, by some concrete action applying the
regulation to the claimant's situation in a fashion that harms or threatens to harm
him.").

The 2005 Travel Management Rule is a "final agency action" within the
meaning of the 5 U.S.C. § 704 as it is "an agency statement of general or particular
applicability and future effect designed to implement, interpret, or prescribe law or
policy." *Id.* at 149 (citing 5 U.S.C. §§ 551(4), 551(13)). However, the Forest
Service did not rely on the 2005 Travel Management Rule in its application of the
minimization criteria. The Service explains its application of the minimization
criteria to snowmobile impacts and makes no mention of Subpart C's exception.
(Appeals Decision, I4-05, 95.) *See Earth Is. Inst.*, 490 F.3d at 696 (holding that an
incomplete record precluded judicial determination of particular regulations
because the plaintiffs failed to show that the challenged regulations were applied
in the context of the project in question).

Because the regulation in question was not applied in Plaintiffs' case, the
record is "speculative and incomplete" regarding that specific regulation and it not
fit for judicial determination.

## V. Conclusion

For the reasons stated above, IT IS HEREBY ORDERED that Defendants'
and Defendant-Intervenors' motions for summary judgment (docs. 35, 39) are
GRANTED as to Plaintiffs' first and third claims for relief. Plaintiffs' motion for
summary judgment (doc. 26) is GRANTED in part and DENIED in part as to their
second claim for relief. It is GRANTED insofar as the Forest Service must apply
the E.O. 11644 minimization criteria to specific snowmobile routes where specific
routes are designated and it is DENIED in all other aspects. All other aspects of
Plaintiffs' second claim for relief are GRANTED in favor of the Defendants and
Defendant-Intervenors.

IT IS FURTHER ORDERED that Plaintiffs' Motion to Strike (doc. 35) is
GRANTED. The Third Declaration of Jan Bowey Certifying Additional
Administrative Record Documents and the attached documents (docs. 34, 34-1,
34-2) are hereby STRICKEN from the record.

IT IS FURTHER ORDERED that this case is remanded to the Forest
Service for the limited purpose of applying the minimization criteria mandated by
E.O. 11644 at the route-specific level where specific snowmobile routes are
designated. The Forest Service shall perform this analysis and update the Revised
Forest Plan by September 30, 2012. A failure to do so will result in the suspension

of the winter travel management portion of the Revised Forest Plan as of October 1, 2012.

IT IS FURTHER ORDERED that the Clerk of Court shall enter judgment in accordance with this order and close this case file.

Dated this 2nd day of April 2012.

15:35 p

Donald W. Molloy, District Judge
United States District Court.